FORREST E. VANDERPOOL V. STATE.

No. 24963. December 13, 1950.

*E. E. Cornelius, Jr.*, and *Justice, Moore & Justice*, Athens, for appellant.

*George P. Blackburn*, State's Attorney, Austin, for the state.

WOODLEY, Judge.

Appellant was convicted of the offense of rape, and the jury assessed his punishment at five years' confinement in the penitentiary.

The contention that the evidence is insufficient to sustain the conviction is the sole ground urged in appellant's brief on this appeal.

The woman alleged to be the victim was shown to be sixty-two years of age and in poor health. She was a widow, having been divorced twice, and was a practical nurse.

According to the state's testimony, appellant first saw the prosecutrix at a cafe, where he overheard her inquiring where she might get a room. Appellant told her that she could get a room where he stayed, and followed her as she left the cafe to go there. Upon arriving, the two entered a trailer house, which appellant told her she could occupy—that he would go to another room.

Upon entering the trailer house appellant closed the door, and handed the woman fifty cents, which she immediately returned to him.

The alleged victim testified as to the happenings in the trailer house in part as follows:

"Well, he had an expression on his face that told me something. I didn't know whether it was to kill me, or what.

"Well, he walks up to me and I could see the expression on his face that told me something ---- It was to kill me, or something, I didn't know what. Then, I says: 'My God, boy,' I says: 'An old woman like me, sixty-two years old,' I says: 'Why don't you get a younger person, not pick on an old lady like me?' He said: 'Well, you have to take anything these days.' So, he had me pull my clothes off. He had his hands like he was going to choke me. He put his hands on my throat, and he says: 'If you don't do this, I will have to choke you down.' I said: 'Well, don't do that, I will.'

"Then he started to pull my clothes off, and I pulled them off. He even pulled off my shoes and stockings.

"After he told me he would choke me down, he began choking me. Yes, he did choke me with his hands. I told him for God's sake not to do that, I would go ahead, if he wouldn't kill me. After he pulled my clothes off, he said: 'get down there on that bed.' And he choked me again. I got on the bed. Yes, he indicated that he wanted to have sexual intercourse with me, and after he got me on the bed, well, he had intercourse.

"Yes, he hurt me; not much, tho.

"Yes, I was at that time still suffering from the stroke I had in June and from the flu, and I still am.

"No, Sir, I certainly did not give him my free consent at the time he had intercourse with me.

"Yes, that was done without my consent and by force and threats that he made. I was scared to the inch of my life, just because of the threats he made to me.

"Certainly, I was afraid he would do something to me if I didn't have intercourse with him. I was afraid he would kill me. After the intercourse he threatened to keep me there all night. He finally got up and dressed and let me dress. Then he said: 'I know you are going to call the cops.' I said: 'No, I am not going to call no cops.' I told him that because I was afraid of him. I was afraid he would kill me if I did that. He said he would kill me if I did.

"While we were still in the trailer house he said: 'If we had been on the outside you would have fought me, wouldn't you? I told him I was afraid I would.

"He said I know you are going to tell the cops, and I said: 'No, I am not.' And he made me take an oath that I wouldn't tell the cops.

"He said he was going to watch me and if I called the cops, he was going to kill me.

"Yes, after that we finally left the trailer house and went on to Mr. Gilliam's, and he introduced me as Mrs. Pat to Mr. Gilliam.

\* \* \* \* \* \* \* \*

"No, I did not tell Mr. Gilliam that night what had happened. The reason I didn't—Well, they were rank strangers, and I didn't see Mrs. Gilliam, and I was scared of what he had told me. I didn't know whether he had left or not. I had no way of knowing.

"Well, I didn't sleep any that night, and the next morning I saw Mrs. Gilliam out in her front yard, and I went out there where she was. And I told her all about it, and I told her to go talk to her husband and see what he thought about it. Yes, she was the first and only woman I had seen since this had happened.

"Yes, at the time I told Mrs. Gilliam, I was still afraid of the threats the defendant had made."

Appellant did not testify, but the state offered his voluntary confession where he gave the following version of the events in the trailer house:

"* * * I told her she could sleep in the trailer house all night and I would sleep in one of the cabins which were unlocked. She said she would like to see the trailer house so I took her back there. When we got back there I grabbed the woman and kissed her. We were already in the house and I had closed the door behind us. She told me she was too old for me to be messing with, why didn't I get somebody my own age. She told me she had children older than me and not to bother her. I stripped off all my clothes and ask her to take off her clothes. She was against it, but I told her to take them off again sort of rough. I was standing between her and the door, I helped her undress, and took all of her clothes off. She said please don't expose me. She was already setting on the bed. I pushed her shoulder back. She didn't say anything. I got on her and had intercourse with her. I was on her about 5 minutes. We dressed and I ask her did she enjoy it and she wouldn't say one way or the other. I ask her was she going to call the police and she said no but I didn't believe her so I ask her to swear on a Bible I had that she wouldn't call the police."

When arrested the following day near the noon hour, appellant was leaving the trailer house carrying his personal belongings, clothes, razor and such things, in a paper bag.

The evidence shows that the trailer house in question was located in the rear of the rooming house owned by H. T. Gilliam, a distance of some 50 feet, and that there were other houses nearby and a number of other trailer houses, some only 15 or 20 feet away.

It is appellant's contention that no sufficient resistance against appellant's advances is shown, and there was no outcry. Much stress is laid upon the testimony of Mr. and Mrs. Gilliam that they saw no evidence of the prosecutrix being other than normal on the night following the alleged attack upon her in the trailer house. He also stresses her failure to report the occurrence prior to her telling Mrs. Gilliam about it the next morning.

Art. 1184, P.C., provides that in order to constitute rape by force, the force used must be such as might reasonably be supposed sufficient to overcome resistance, taking into considera-

tion the relative strength of the parties and other circumstances of the case.

In determining the sufficiency of the force used, the jury is authorized to take into consideration threats made at the time of the commission of the offense. See Finch v. State, 154 Tex. Cr. R. 158, 225 S.W. 2d 861; Cole v. State, 57 Tex. Cr. R. 51, 123 S.W. 409.

The prosecutrix explained her failure to report the matter or to make outcry, the reasonableness of which explanation was for the jury to determine. See Ex Parte Merrill, 150 Tex. Cr. R. 365, 201 S.W. 2d 232.

Also, we think that the testimony of the prosecutrix is corroborated by the confession of appellant and the circumstances of his arrest.

In his motion for new trial, appellant alleged that the jury was guilty of misconduct in that those favoring a conviction argued to those opposed that appellant had failed to take the witness stand and tell the jury under oath that he was not guilty.

The state joined issue as to the truth of such allegation, and the court heard testimony from jurors in person and by affidavit.

The trial court determined the issue raised by the evidence, and resolved such issue against appellant. From an examination of the evidence heard, we are unable to agree that the trial court abused his discretion in determining that the alleged misconduct did not occur, especially in view of the affidavits of some of the jurors to the effect that their prior affidavits furnished to appellant were incorrect.

The evidence being deemed sufficient to support the conviction and no error appearing, the judgment is affirmed.

Opinion approved by the court.