**Donald Preston TODD, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 43715**

Court of Criminal Appeals of Texas.

May 12, 1971.

---

Thomas A. Autry, Austin (on appeal only), for appellant.

Robert O. Smith, Dist. Atty., Harold Jaquet and Lawrence Wells, Asst. Dist. Attys., Austin, Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

ODOM, Judge.

This appeal is from a conviction for the offense of rape. The state did not file a declaration that it would seek the death penalty and appellant waived his right to a trial by jury. Punishment was assessed by the court at 16 years.

The sufficiency of the evidence is challenged.

The record reflects that the prosecutrix, an 18 year old girl, was at Shipe Park, on 45th Street in Austin, at approximately 1:00 A.M. on June 2, 1969; that she had just been "dropped off" there by a friend and started walking toward North Lamar when appellant drove up and asked her if she wanted a ride; she responded that she did and got into the car and told appellant where she wanted to go, but he started in another direction. The record then reveals the following:

"Q. When did you first notice you weren't going to Lamar?

"A. When he started heading out on South Interregional.

"Q. Did you do anything to try to stop his driving the car?

"A. Yes, sir.

"Q. What did you do?

"A. I tried to attract attention to two boys in a car behind us.

"Q. How did you try to attract attention to you?

"A. I threw my shoes out and tried to get out of the car.

"Q. When you tried to get out of the car, what did the defendant do?

"A. He grabbed me and closed the door and locked it.

"Q. Did he say anything to you?

"A. He said, 'What are you, crazy or something; do you want to kill yourself?'

"Q. Where did the defendant take you?

"A. Over a low-water bridge—it was—I don't know where it was; it was on a clearing.

"Q. Did he stop the car?

"A. Yes, sir.

"Q. What did he do—what was the first thing he did after he stopped the car?

"A. Well, I was crying, and he started choking me.

"Q. He started choking you?

"A. Yes, sir.

"Q. With both hands?

"A. Yes, sir, and he kept telling me to shut up.

"Q. He kept telling you to shut up; did he tell you anything else?

"A. He started telling me to take off my clothes.

"Q. What did you do or say?

"A. I didn't want to, and I kept crying, and he started choking me more, so I did as he said.

"Q. When he was choking you, did you resist him?

"A. Yes.

"Q. Did you resist as hard as you could at that time?

"A. Yes, sir, I was.

"Q. Did you take off your clothes?

"A. Yes, sir.

"Q. Were you inside the car?

"A. Yes, sir.

"Q. What did the defendant do?

"A. Then he raped me, and afterwards he took off for a place; he told me to put my clothes on.

\* \* \* \* \* \*

"Q. And what did he do with his hands?

"A. He was just—he just kept telling me to do as he told me to do, so I was scared to death of him. I don't remember everything that happened that night.

"Q. Did the defendant have sexual intercourse with you?

"A. Yes, sir.

"Q. Did you consent to that?

"A. No, sir."

Appellant then took prosecutrix to another location near a golf course where he raped her again, and told her: "By the time they find you, I will be in San Antonio." He then got out of the car and went around in front of it. Prosecutrix locked the car door, started the car and drove off, trapping appellant on the hood. The car hit a bump and appellant fell off and the prosecutrix drove on. She found a policeman and was taken to Brackenridge Hospital.

Sergeant Kelley, of the Austin Police Department, testified that he was the officer that the prosecutrix happened upon, and that he searched the car she was driving and found a driver's license and bill of sale belonging to appellant; he also testified that when he first encountered prosecutrix, she was in a hysterical state. Officer Shephard, of the Austin Police, testified that he received a call to meet Sergeant Kelley at the location where the car was stopped; that when he arrived the prosecutrix told him she had been forcibly raped. He took her to the hospital. The records from the hospital concerning the prosecutrix' examination on this occasion reflect that she had had intercourse and the sperm tests were positive; the medical examination also revealed abrasions upon her neck.

Appellant, by his two grounds of error, contends the evidence was insufficient to show lack of consent and that force and threats were used to overcome the will of the prosecutrix. Testifying in his own behalf, appellant admitted having sexual intercourse with the prosecutrix, but claimed that he did so with her consent and that he did not force or threaten her. He stated that he was 39 years old and admitted to having been convicted of a felony in 1952. The record then reflects:

"Q. What were you convicted for?

"A. *Distributing* to a minor, statutory rape.

"Q. How long were you sentenced to?

"A.  Two to twenty-one, sir.

"Q.  And that was in what state?

"A.  Indiana."

The trial court rejected appellant's testimony that he used no force and threats and that the intercourse was with consent. We hold that it was justified in so doing and the evidence is sufficient to support the conviction. In Vanderpool v. State, 155 Tex.Cr.R. 318, 234 S.W.2d 879, this court upheld a conviction involving a similar factual situation where the prosecutrix was choked before submitting to her assailant. See also Hemphill v. State, Tex.Cr.App., 467 S.W.2d 412 (1971); Whitaker v. State, Tex.Cr.App., 267 S.W.2d 264 (1971); Harris v. State, Tex.Cr.App., 441 S.W.2d 189; Perbetsky v. State, Tex.Cr.App., 429 S.W.2d 471; Broadway v. State, Tex.Cr.App., 418 S.W.2d 679; Williams v. State, Tex.Cr.App., 414 S.W.2d 933.

There being no reversible error, the judgment is affirmed.